# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LLW ENTERPRISE, LLC, and VOLT, LLC,

      Plaintiff,                         CASE NO:

v.

TIM RYAN; RONNY TANG SIP SHIONG;
JOSHUA JOHNSTON; NIGHTSCAPING,
LLC; CORELIGHT HOLDINGS, LLC; SCI
POWERTECH LLC; SIDERA LLC;
LIGHTHOUSE MANUFACTURING AND
DISTRIBUTION, LLC; and LIGHTHOUSE
FRANCHISE SYSTEMS, LLC

        Defendants.                    /

## COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

Plaintiffs, LLW Enterprise, LLC ("LLW") and Volt, LLC ("Volt"), sue Defendants,

Tim Ryan, Ronny Tang Sip Shiong, Joshua Johnston, Nightscaping, LLC, Corelight Holdings,

LLC, SCI Powertech LLC, Sidera LLC, Lighthouse Manufacturing and Distribution, LLC and

Lighthouse Franchise Systems, LLC, and allege as follows:

## I. *INTRODUCTION*

This case is brought by two related companies that revolutionized the outdoor lighting

industry by being the first to manufacture high quality outdoor lighting products that they then

sell directly to homeowners via an online store.  After achieving great success, Plaintiffs hired

Defendant, Tim Ryan, to help them develop and promote a new line of professional outdoor

lighting products.  Ryan signed appropriate restrictive covenants and was given access to

Plaintiffs' proprietary information and business plans. While still working for Plaintiffs, Ryan breached his covenants and conspired with his co-Defendants, a group of commonly owned businesses and their principals, to unfairly compete with Plaintiffs.

Defendants next induced Ty Russum, Plaintiffs' former head of marketing and e-commerce, to join them in their venture *despite being advised by their own lawyers that doing so would cause Russum to violate his own restrictive covenants with Plaintiffs*. Russum, like Ryan, provided Defendants with highly valuable confidential information, including Plaintiffs' marketing strategies and detailed website analytics. Defendants further schemed to conceal the hiring of Ryan and Russum through alias email address, payments from offshore accounts, and by lying to Plaintiffs about Ryan's activities.

Through the wrongful use of Plaintiffs' valuable confidential information, Defendants have unfairly competed with Plaintiffs. As one example, Defendants acquired a trademark that Plaintiffs had planned to use, even though Defendants had no *bona fide* intent to use it and only knew about Plaintiffs' plan to acquire and use it through Ryan's wrongful disclosures. Defendants have since filed fraudulent statements with the U.S. Patent and Trademark Office to maintain the trademark's registration, thus blocking Plaintiffs' legitimate efforts to obtain their own registration. More recently, Defendants have thwarted Plaintiffs' efforts to cancel Defendants' invalid trademark registration by both destroying and forging evidence. Defendants' actions on this one issue have thus caused Plaintiffs to incur over two hundred thousand dollars in costs and fees in a TTAB cancellation proceeding that is far from over.

Plaintiffs now bring this action to enjoin defendants from continuing their wrongful acts and to recover their own damages and Defendants' unjust enrichment.

## II.    *JURISDICTION, PARTIES, AND VENUE*

1.    This court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, as it is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.    Specifically, Plaintiffs Volt, LLC and LLW Enterprise, LLC are Florida limited liability companies with their principal place of business at 15486 N Nebraska Ave. in Lutz, Florida, owned by citizens of Florida, and all of their respective members are citizens of Florida.

3.    Defendants are citizens of states other than Florida, as follows:

   a.   Defendant Timothy Ryan ("RYAN") is, on information and belief, a citizen of Indiana;

   b.   Defendant Ronny Tang Sip Shiong ("TANG SIP SHIONG") is, on information and belief, a citizen of Pennsylvania;

   c.   Defendant Joshua Johnston ("JOHNSTON") is, on information and belief, is a citizen of Ohio;

   d.   Defendant Nightscaping, LLC ("NIGHTSCAPING, LLC") is a Pennsylvania for-profit corporation.  The identities of the managers and/or members of NIGHTSCAPING, LLC are not publicly available, but based on information and belief none are citizens or residents of Florida.

   e.   Defendant Corelight Holdings, LLC d/b/a/ Corelight ("CORELIGHT") is a Pennsylvania for-profit corporation.  The identities of the managers and/or

members of CORELIGHT are not publicly available, but based on information and belief none are citizens or residents of Florida.

f. Defendant SCI Powertech, LLC ("SCI") is a Pennsylvania for-profit corporation. The identities of the managers and/or members of SCI POWERTECH are not publicly available, but based on information and belief none are citizens or residents of Florida

g. Defendant Sidera LLC ("SIDERA") is a Pennsylvania for-profit corporation. The identities of the managers and/or members of SIDERA are not publicly available, but based on information and belief none are citizens or residents of Florida.

h. Defendant Lighthouse Manufacturing and Distribution LLC ("LIGHTHOUSE MANUFACTURING") is a Pennsylvania for-profit corporation. The identities of the managers and/or members of LIGHTHOUSE MANUFACTURING are not publicly available, but based on information and belief none are citizens or residents of Florida.

i. Defendant Lighthouse Franchise Systems, LLC d/b/a/ Lighthouse Outdoor Lighting ("LIGHTHOUSE FRANCHISE") is an Ohio for-profit corporation, located at 855 Congress Park Drive, Centerville OH 45459, which may be served through its registered agent and Operating Manager, Joshua Johnston, at that address. The managers and members of LIGHTHOUSE FRANCHISE are not publicly available, but based on information and belief, none are citizens or residents of Florida.

4.  This Court has personal jurisdiction over Defendants as follows:

a.  This Court has personal jurisdiction over RYAN at least pursuant to Fla. Stat. §§48.193(1)(a)(1), (2), (7), and (9) inasmuch as he (i) conducted business within the State of Florida, (ii) committed tortious acts in Florida and intentionally directed at Florida citizens, understanding that the Florida business would be harmed, (iii) breached a contract in this state by failing to perform acts required by the contract to be performed in Florida, (iv) engaged in a conspiracy in this state (a) with others who are subject to personal jurisdiction in this state and who took acts in this state in furtherance of the conspiracy, and (b) took acts in this state in furtherance of the conspiracy, and (v) entered into a contract that complies with §685.102 in that this action arises out of or relates to a contract which contains a provision by which RYAN agreed to submit to exclusive jurisdiction of the state or federal courts located in Hillsborough County, Florida.

b.  This Court has personal jurisdiction over Defendant SIP SHIONG TANG and JOHNSTON at least pursuant to Fla. Stat. §§48.193(1)(a)(1) and (2) inasmuch as they (i) conducted business within the State of Florida, (ii) committed tortious acts in Florida and intentionally directed at Florida citizens, understanding that the Florida business would be harmed, and (iii) engaged in a conspiracy in this state (a) with others who are subject to personal jurisdiction in this state and who took acts in this state in furtherance of the conspiracy in

this state, and (b) TANG SIP SHIONG and JOHNSTON each took actions in this state in furtherance of the conspiracy.

c.  This Court has personal jurisdiction over NIGHTSCAPING, LLC, CORELIGHT, SCI, SIDERA, LIGHTHOUSE MANUFACTURING, and LIGHTHOUSE FRANCHISE (hereafter collectively "the CORPORATE DEFENDANTS") at least pursuant to Fla. Stat. §§48.193(1)(a)(1) and (2) inasmuch as they (i) conducted business within the State of Florida, and (ii) committed tortious acts in Florida through their agents and intentionally directed at Florida citizens, understanding that the Florida business would be harmed, and (iii) and engaged in a conspiracy in this state through their managers and/or agents, including RYAN after he was retained, TANG SIP SHIONG, and JOHNSTON (a) with others who are subject to personal jurisdiction in this state and who took acts in this state in furtherance of the conspiracy, and (b) RYAN (after he was retained), TANG SIP SHIONG, and JOHNSTON each took actions in this state in furtherance of the conspiracy.

5.  TANG SIP SHIONG is the indirect full or partial owner of each of the CORPORATE DEFENDANTS, as he owns the controlling interest in non-party TQS Holdings, LLC, which in turn is the owner of CORELIGHT, which in turn is the parent company of each of the remaining CORPORATE DEFENDANTS.  On further information and belief, JOHNSTON, during material times hereto, was a partial owner of LIGHTHOUSE. At all times material to the acts that gave rise to this dispute, TANG SIP SHIONG and JOHNSTON were agents of each other and of each of the CORPORATE DEFENDANTS, as

each of them acted in concert in furtherance of the conspiracy to steal Plaintiffs' valuable confidential information and to induce Tyson Russum and RYAN to breach their restrictive covenants with Plaintiffs, as set out more fully herein. After RYAN was retained to work for TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS, he became the agent of each of them. After Russum was retained to work for TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS, he became the agent of each of them

6.    This Court's exercise of personal jurisdiction over Defendants is consistent with the Constitutions of the United States and the State of Florida.

7.    This action is properly brought in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to this action occurred in the State of Florida.

## III.    FACTS

### A.    PLAINTIFFS DEVELOP A UNIQUE AND SUCCESSFUL BUSINESS

8.    In 2007, Plaintiffs' founder discovered that high quality outdoor lighting products, such as durable brass fixtures for example, were only available for sale to professional installers, typically through brick and mortar distributors, resulting in high costs. Do-it-yourself homeowners could only buy low quality outdoor lighting. To fill this unmet market need, he founded LLW Enterprise, LLC, and Volt, LLC (LLW and Volt collectively referred to as "Plaintiffs"). These Tampa-based companies would revolutionize the outdoor lighting market by selling high quality products directly to individual consumers from a unique online store for delivery directly from the warehouse.

9.     To succeed in a new market niche, Plaintiffs had to develop a quality line of products, an e-commerce website, a novel marketing strategy, and the customer support necessary to educate homeowners and convince them to purchase and install high quality outdoor lighting on their own. These were new concepts when Plaintiffs launched their business in 2008. Through trial, error, and with great expense, Plaintiffs developed a winning marketing strategy, learned which products were successful and which were not, refined customer service and support, and built an entirely new and unique market niche in the lighting industry.  Plaintiffs' pioneering spirit, substantial investment, and hard worked paid off. Within two years, Plaintiffs' website was the top organic search result on Google for outdoor lighting.

10.     Plaintiffs continued to develop their business to ensure their viability and top position in the market they pioneered, creating valuable and highly confidential proprietary information in the process.  This information includes, but is not limited to, financial information, its product manufacturing sources, its customer service strategies, its internet marketing strategy, all of its extensive internet and business analytics, its website design and architecture and the success it experienced with the various facets of each, its business development and promotion strategies, its new product design and launch plans, its product line naming strategies, its internal warehouse/accounting/shipping/product management/customer relationship management and customer service operations, and the like.

11.     Plaintiffs have taken great efforts to ensure that this information is protected and not distributed outside the companies. As a condition of employment, Plaintiffs require employees and independent contractors to sign appropriate restrictive covenants that are to be

interpreted in accordance with Florida law, and preclude the disclosure and/or use of valuable confidential information, the solicitation of employees or customers, the removal of intellectual property and other developments created for Plaintiffs' business, and directly competing with Plaintiffs during employment and for a reasonable period thereafter.  The importance of maintaining the secrecy of confidential and proprietary information is stressed by Plaintiffs' management.   Plaintiffs' offices are secure, and they routinely shred documents to prevent valuable confidential information from being compromised.

12.    Plaintiffs' computer network is also secure.  All users must log in using their own password and userID to access the network and all customer, marketing, website, inventory, and financial databases.  In addition, access to certain portions of the network is limited to those employees whose job duties require such access and is controlled via user name and password.  Access to Plaintiffs' facilities is strictly controlled, as employees must use a code to enter and outsiders are not permitted to enter.  Plaintiffs' confidential, proprietary and trade secret information has substantial value in the industry, and disclosure of this information to outsiders would cause irreparable harm to Plaintiffs' business as well as extensive money damages.

**B.    PLAINTIFFS HIRE A NATIONAL SALES CONSULTANT (RYAN)AND A HEAD OF E-COMMERCE AND MARKETING (RUSSUM), AND BOTH SIGN RESTRICTIVE COVENANTS**

13.    Plaintiffs' business continued to grow rapidly. Their products, pricing, and exceptional customer service began attracting professional installers and electrical distributors as well as homeowners as customers. To further develop their market share among professional installers, Plaintiff decided to create a separate product line, branding, and website with an e-

commerce store just for professional installers, which store they branded with the trademark "AMP".

14.     As part of this strategy, Plaintiffs retained Indiana-based Defendant RYAN -- a professional outdoor lighting installer -- to serve as their National Sales Consultant, and to become the "face" of Plaintiffs' professional line featured in instructional videos and promotions. Plaintiffs chose RYAN for this important position because he was one of their professional customers, so he already believed in their products and customer service, and because he was known among installers because of his participation in industry forums. Because of this background, RYAN was familiar with the "target market" of professional installers and could influence them to buy Plaintiffs' products.  RYAN could also advise Plaintiffs on how to strategically select and promote the new professional line of products that would appeal to professional installers. RYAN was also experienced in producing instructional videos and high-quality nighttime photographs and videos of installations, and he would provide these services to Plaintiffs as well.

15.     When RYAN began working with Plaintiffs, he was exposed to the inner workings of Plaintiffs' new market niche.  This included Plaintiffs' confidential plans to develop a new product line, branding strategy, and e-commerce store specifically for professionals. Plaintiffs also shared with him valuable and confidential website and e-commerce analytics that they had acquired over time and at great expense.  RYAN received valuable specialized training and know-how concerning Plaintiffs' products and distribution methods.  RYAN became Plaintiffs' trusted consultant.  He also became the ambassador for Plaintiffs' products through his appearances in videos and promotions on Plaintiffs' high traffic

e-commerce sites.  All of the foregoing were some of Plaintiffs' legitimate business interests requiring protection by the covenants RYAN signed, discussed further below, and upon which Plaintiffs relied.

16.    Around the same time they hired RYAN, Plaintiffs hired Ty Russum to head their marketing and e-commerce efforts. Mr. Russum reported directly to Plaintiffs' founder and CEO.  His responsibilities included website design and maintenance, website customer experience, search engine optimization (SEO), analytics, managing existing and developing new internet marketing channels, selecting and implementing enterprise resource planning software, and developing marketing campaigns utilizing highly confidential analytics and unique business methods disclosed to Mr. Russum for the purposes of his job duties.

17.    At the time he was hired by Plaintiffs, Russum had no prior experience in the outdoor lighting industry. More importantly, his position required that he be made aware of highly proprietary and valuable confidential information concerning many years of marketing trial and error, business methods, analytics, and Plaintiffs' products, all of which were very costly and took years to develop in this new lighting market channel. Thus, Russum received valuable specialized training and know-how that was not available anywhere else in the industry.  Clearly, Mr. Russum would become *the* e-commerce marketing professional who could provide a substantially unfair advantage for anyone desiring to break into Plaintiffs' newly pioneered market channel if they could induce him to disclose Plaintiffs' wealth of proprietary marketing and e-commerce business methods, developments, and analytics. For these and other reasons, Plaintiffs have substantial and legitimate business interests in the restrictive covenants Mr. Russum signed and upon which Plaintiffs relied.

18.    As a condition of their initial and/or continued retention, and to protect Plaintiffs' legitimate business interests, both RYAN and Russum entered into appropriate restrictive covenants.  The provisions of these covenants will be discussed in further detail below, but in general, both Russum and RYAN agreed not to use or disclose Plaintiffs' valuable confidential information outside of their duties to Plaintiffs.  They agreed not to compete or help others compete with Plaintiffs while retained by Plaintiffs and for two years afterward.  They both agreed that Plaintiffs owned all intellectual property and other developments created for Plaintiffs' business, whether or not jointly created with others. They agreed that Florida law would govern the covenants, and that they would be responsible to Plaintiffs *for all their unjust gains* resulting from any breach. They also agreed that they would be responsible to Plaintiffs for their damages, including attorney's fees.  The restrictive covenants signed by RYAN are attached as Exhibits A-D ("RYAN's Covenants"); the restrictive covenants signed by Russum  are attached as Exhibits E & F ("Russum's Covenants", and RYAN's Covenants and Russum's Covenants are collectively hereafter referred to as "the Covenants").  RYAN also later signed a Brand Ambassador Agreement, attached as Exhibit G, in which he, *inter alia*, acknowledged his non-compete and confidentiality obligations.

**C.    PLAINTIFFS DISCLOSE THEIR CONFIDENTIAL NIGHTSCAPING BUSINESS PLAN TO RYAN**

19.    In addition to the above, RYAN's Covenants included tailored provisions concerning the disclosure to RYAN of Plaintiffs' "new fixture brand for contractors only, the possible name(s) of [Plaintiffs'] new product brands, [Plaintiffs'] new indoor LED bulb line,

[Plaintiffs'] new AMP® product line, the market positioning, sales strategy, pricing, distribution, construction, design and product details of the aforementioned." Exhibit B. at 1.

20.      In reliance on this Covenant (as well as the others), Plaintiffs disclosed and sought RYAN's advice on Plaintiffs' new confidential business strategy to acquire the trademark NIGHTSCAPING – an existing professional lighting products brand – from its owner that had gone out of business and to use it to launch a new professional lighting brand that Plaintiffs were developing.  Specifically, Plaintiffs' CEO sent an email to RYAN asking for his input on this business plan, observing that with RYAN "*heading up industry relations and contractor channels, this [NIGHTSCAPING mark and professionals-only product line] could be a major development*" for Plaintiffs.

21.      RYAN responded that the idea was intriguing, and agreed that "***Nightscaping is (or was) the first name in landscape lighting, so aquiring [sic] the name is an interesting thought since it is so recognizable − (at least to lighting contractors).***" (emphasis added). Using the NIGHTSCAPING trademark to target professional installers was also a good idea, RYAN agreed, because the NIGHTSCAPING mark "*commands a degree of respect, simply due to the fact that they were the first − they were the innovators in landscape lighting.*"  In short, Nightscaping was not just another trademark in the industry, but one that was once well-known among professional installers and therefore would likely still resonate with many of them.  As RYAN observed, "***In the minds of most lighting industry professionals, the name Nightscaping is synonymous with landscape lighting.***"  (emphasis added).

22.      RYAN also observed that Plaintiffs' plan to use the trademark on "*a completely new line of products,*" would "*get [Plaintiffs] noticed for su*re" among professional installers.

RYAN suggested that if Plaintiffs were also to revamp some of those original Nightscaping products that were popular with installers to include "*[Plaintiff Volt's] LED technology,*" it would be seen as Plaintiff "*honoring the legacy of Bill Locklin [NIGHTSCAPING's founder] by retaining and upgrading the best of their line while adding the all new 21st century line that everyone is looking to these days with the new dimmable series*." This plan, RYAN observed, "***would make some installers very, very happy and could build some loyalty to a new manufacturer.***" (emphasis added). This was an important goal, as some professional installers were upset when Plaintiffs first arrived on the market because their business model of selling quality products directly to homeowners at low prices reduced the profit margin that professional installers had previously enjoyed. As such, winning their business and loyalty was a very important key to the success of the launch.

23.      RYAN next observed that Plaintiffs' pioneered direct-to-consumer model "*is the path to the future of exponential growth*." After learning of Plaintiffs' plans to provide 1-2 day delivery to the client-heavy West Coast, RYAN concluded that, "***There is no stopping us.***" (emphasis added). RYAN was so impressed with the overall plan that he summed up his analysis in one sentence: "***It will revolutionize the professional lighting industry.***" (emphasis added).

24.      RYAN then contrasted the difficulties that Plaintiffs would encounter if they tried to break into the market without the NIGHTSCAPING trademark. RYAN predicted, "***To enter the industry with an unknown name is going to be far more difficult for us to get traction with contractors. At [trade shows], will [sic – we'll] just be 'another new lighting manufacturer'- adding their wares to the marketplace.***" Using the NIGHTSCAPING

trademark as part of Plaintiffs' new strategy, on the other hand, would likely give them **"a 2-3 year jump start over starting with a no-name brand."**

25.    With RYAN'S enthusiastic confirmation and analysis, Plaintiffs immediately began negotiations to buy the NIGHTSCAPING Trademark Registration. After Plaintiff Volt and the trademark seller each signed a non-disclosure agreement, Plaintiffs engaged legal counsel to conduct due diligence.   During this process, Plaintiffs determined that there were serious problems that could result in the registration being cancelled and/or subject a purchaser of the mark to creditor claims.  Plaintiffs ultimately offered to buy NIGHTSCAPING for a reduced but still substantial sum, with the proviso that the seller indemnify Plaintiffs should any claims against the trademark arise.  The seller refused, and thereafter refused to negotiate further, even though Plaintiffs' next offer did not require that the seller agree to indemnify Plaintiffs, indicating her concern that Plaintiffs may ultimately sue her in connection with problems with the trademark.  The seller also indicated that she had changed her mind, and would not be selling the trademark to anyone.

26.    Based on this information, Plaintiff Volt filed its own application with the U.S. Trademark Office to register NIGHTSCAPING, based on its intent-to-use the mark in commerce in conjunction with "outdoor lighting fixtures, bulbs for outdoor lighting fixtures, accessories and wiring for outdoor lighting fixtures."

27.    In his capacity as Plaintiffs' consultant, RYAN was made aware of the results of Plaintiffs' costly due diligence process and the substance of all negotiations, including the seller's highly adverse reaction to being asked to provide indemnification.  By this time, RYAN had also traveled to Plaintiffs' facilities in Tampa, at the expense of Plaintiffs, to examine and

provide extensive advice to Plaintiffs on their new product developments, which were still in the confidential developmental stage.  He had confidential discussions with Plaintiffs' CEO and learned Plaintiffs' business plans and marketing strategies so he could help carry them out. He also became acquainted with Ty Russum as the two began to work together.

### D.    RYAN BREACHES COVENANTS AND CONSPIRES WITH OTHER DEFENDANTS AND RUSSUM

28.    Unbeknownst to Plaintiffs, *and while still engaged by Plaintiffs*, RYAN soon began divulging Plaintiffs' confidential and proprietary information to Defendants JOHNSTON and TANG SIP SHIONG, as they were forming a new lighting industry partnership.  It all happened because JOHNSTON had owned Defendant LIGHTHOUSE – a franchisor for outdoor lighting installation services – and he knew RYAN well from their long history of working together in JOHNSTON's franchise businesses.  TANG SIP SHIONG, as the indirect owner through holding companies of Defendant SCI, had been JOHNSTON'S vendor for outdoor lighting transformers.  TANG SIP SHIONG had the capital and desire to expand into the lucrative outdoor lighting market, but he lacked the industry know-how.  Thus, he decided to partner with JOHNSTON.

29.    JOHNSTON then introduced RYAN to TANG SIP SHIONG. Learning that TANG SIP SHIONG had significant funds and wanted to expand into the outdoor lighting industry and compete with Plaintiffs, RYAN proceeded to breach each and every significant Covenant he had entered into with Plaintiffs, resulting in unjust enrich for himself, and significant harm to Plaintiffs.

30.    Specifically, while still working for Plaintiffs, RYAN helped TANG SIP SHIONG and JOHNSTON set the groundwork to copy Plaintiffs' business plan to establish

two direct-to-customer e-commerce stores -- one for homeowners and another for professionals. He divulged all of Plaintiffs' confidential and proprietary information to ensure their success. He quickly helped them convince Russum to breach his Covenants and secretly work for them as well, thus acquiring Russum's substantial knowledge of Plaintiffs' proprietary operations, including e-marketing strategies and extremely valuable and confidential analytics. RYAN told them exactly how to acquire the NIGHTSCAPING trademark, thereby blocking Plaintiffs' trademark application and derailing Plaintiffs' associated business plans.

31.    TANG SIP SHIONG rewarded RYAN handsomely for his breaches. Disguised as an "acquisition" of RYAN'S small local outdoor lighting installation operation, TANG SIP SHIONG paid RYAN a lump sum large enough for RYAN to immediately purchase a nicer home and a new Mercedes for his wife, according to witnesses who know him personally. RYAN then joined the TANG SIP SHIONG/JOHNSTON enterprise, bringing along Russum.

32.    DEFENDANTS conspired for years to actively conceal from Plaintiffs that Russum was working for Defendants and breaching his Covenants, and that RYAN was also secretly assisting Defendants and breaching his Covenants, including that RYAN was instrumental in helping Defendants acquire the NIGHTSCAPING trademark to block Plaintiffs' business plans, as set forth fully herein. Then, in early 2018, TANG SIP SHIONG and Russum parted ways, and in late 2018 Russum came forward and disclosed the entire scheme to Plaintiffs' CEO, as set forth in greater detail below.[1]

---

[1] The information in this Section D was determined by Plaintiffs' own independent investigation, including through witness interviews, document reviews, and review of deposition transcripts that have not been designated as confidential in the NIGHTSCAPING cancellation proceeding, discussed *infra*.

1. ***DEFENDANTS CONSPIRE TO DEPRIVE PLAINTIFFS OF THE NIGHTSCAPING BUSINESS OPPORTUNITY***

33.    Not long after Plaintiffs' negotiations for the NIGHTSCAPING trademark broke down, RYAN revealed to JOHNSTON Plaintiffs' interest in the NIGHTSCAPING trademark as well as RYAN's counsel to Plaintiffs as to how the mark could be valuably used. He further revealed the results of Plaintiffs' due diligence into the NIGHTSCAPING Trademark Registration, including the issues with the validity of the Registration, the amounts discussed with the seller of the mark, and that it was important *not* to demand indemnity from the seller or even request documents from the seller that would be needed to perform due diligence, in order to avoid the seller again walking away from the bargaining table.  Each of these disclosures is a violation of RYAN's duties of confidentiality, as set forth in Exhibits A-D.  JOHNSTON used this information to persuade TANG SIP SHIONG to purchase the NIGHTSCAPING mark, blocking Plaintiffs' planned use and registration of the mark.

34.    Without any bona fide intent to use the mark, and armed with the knowledge of the NIGHTSCAPING Registration defects and Plaintiffs' experiences learned from attempting to negotiate its purchase, TANG SIP SHIONG and/or JOHNSTON immediately began negotiating with the seller to buy the NIGHTSCAPING trademark.

35.    On June 26, 2014, newly formed NIGHTSCAPING, LLC − indirectly owned by TANG SIP SHIONG and JOHNSTON − bought the NIGHTSCAPING Trademark. Defendant TANG SIP SHIONG signed the paperwork on behalf of NIGHTSCAPING, LLC and provided the necessary funds.  There was no way for Plaintiffs to know of RYAN's involvement at the time.

36.     TANG SIP SHIONG and NIGHTSCAPING, LLC were able to buy the trademark for substantially less than the amount offered by Plaintiffs through the wrongful use of Plaintiffs' valuable confidential information.

37.     On this day or shortly after, RYAN sent JOHNSTON a message congratulating him on the successful acquisition of the NIGHTSCAPING TRADEMARK. TANG SIP SHIONG has since testified in other proceedings that it was JOHNSTON's idea to acquire the trademark.  JOHNSTON has recently denied being able to remember how he got the idea to acquire the trademark.

38.     Although TANG SIP SHIONG quickly acquired the mark through the entity NIGHTSCAPING, LLC, he did so without any plans to use it in commerce. Nonetheless, approximately one month later, NIGHTSCAPING, LLC filed an application to renew the federal trademark registration.  In the renewal application, NIGHTSCAPING, LLC's trademark counsel falsely swore under oath that the NIGHTSCAPING trademark was being used commercially by Defendant NIGHTSCAPING, LLC in relation to landscape lighting.  As evidentiary support, counsel filed a dated product insert that had been developed and used by the original owner before it closed its business, and had never been used by NIGHTSCAPING, LLC.  In reliance on this false renewal application, the U.S.P.T.O. improperly renewed the registration for another ten-year term, through 2024.

39.     The false renewal filing was just the beginning. Because the defunct NIGHTSCAPING registration remained in force when it no longer should have been, it operated as a blocking mark that prevented the U.S.P.T.O. from issuing Plaintiff's registration.

As a result, Plaintiffs were denied ownership of a trademark registration for NIGHTSCAPING and the exclusive right to use it in connection with the launch of their professional product line.

40.     Plaintiff Volt has been forced to file a Cancellation Proceeding against Defendant NIGHTSCAPING, LLC with the Trademark Trial and Appeal Board ("the Cancellation Proceeding").

41.     This Cancellation Proceeding has cost Plaintiffs in excess of two hundred thousand dollars in attorneys' fees, and it is far from over.  As part of the proceeding, Defendants have conspired to manufacture false evidence of trademark use, destroy evidence of nonuse, and withhold evidence of abandonment, thus significantly increasing the costs of the proceeding.  In this present lawsuit, Plaintiffs seek recovery of their costs and fees for the Cancellation Proceeding from Defendants RYAN, TANG SIP SHIONG, JOHNSTON, and corporate Defendants SCI, NIGHTSCAPING, and any others shown to have participated and/or benefitted from the scheme involving NIGHTSCAPING, as special damages, pursuant to, *inter alia,* the wrongful act doctrine.

## 2.     *RYAN FRAUDULENTLY PROCURES AN EXCEPTION TO HIS NONCOMPETE AND CONFIDENTIAL INFORMATION AGREEMENT*

42.     During the exact same month that Defendants purchased the NIGHTSCAPING trademark and RYAN congratulated them, RYAN approached Plaintiffs' CEO and asked for an exception to his Noncompete and Confidential Information Agreement relating to a company called Attraction Lights.

43.     Attraction Lights is a "mom and pop" company located in Minnesota that designs and sells artistic bollard lights that project patterns of shadows and light onto the

ground and surrounding area.  RYAN had worked with Attraction Lights in the past and had sold its bollards as part of his own outdoor lighting installations.  RYAN represented to Plaintiffs' CEO that he only wished to work with Attraction Lights in the same capacity as he had in the past.

44.     Plaintiffs' CEO did not see Attraction Light's niche product and small company size as a threat to his business, so he agreed to amend the Noncompete and Confidential Information Agreement to allow RYAN to work as he previously had with Attraction Lights. See Exhibit C-2 at 1 (hereafter the "Amendment to the Noncompete and Confidential Information Agreement.").  The amendment made clear, however, that "This is the only exception to the non-compete agreement already in force."

45.     In seeking this amendment, RYAN did *not* disclose to Plaintiffs' CEO that he would be using his influence with Attraction Lights to induce them to join him in becoming part of TANG SIP SHIONG and JOHNSTON's enterprise to compete directly, and on a much larger scale, with Plaintiffs.

46.     On the same day that RYAN signed the amendment to the Noncompete and Confidential Information Agreement, RYAN reaffirmed his confidentiality and noncompetition obligations to Plaintiffs, and also memorialized his agreement to be Plaintiffs' brand ambassador and promote Plaintiffs' products.

47.     Specifically, on June 25, 2014, RYAN signed an agreement titled "Tim Ryan - Brand Ambassador – Roles and Responsibilities."  See Exhibit G.  Pursuant to this Agreement, and while secretly well underway making his plans to compete with Plaintiffs, RYAN agreed to identify the "Best of the Best" top 100 professional installers for the benefit of Plaintiffs,

and recruit them to buy their products from Plaintiffs.  Plaintiffs agreed to pay RYAN a commission equal to 10% of the first year's sales to any "Best of the Best" contractors that RYAN recruited to Plaintiffs.

48.    RYAN also acknowledged in writing -- for the fifth time -- in the Brand Ambassador Agreement that he would keep all of Plaintiffs' proprietary information confidential.  He also acknowledged again that he would not promote "directly or indirectly" any other competing product or company or accept compensation from companies (in the lighting industry) that directly or indirectly compete with Plaintiffs.

49.    But RYAN had no intention of helping Plaintiffs.  He never provided the "Best of the Best" list to Plaintiffs as he had agreed.  Instead, he continued to conspire with Defendants in their scheme to use Plaintiffs' proprietary information to launch a directly competing enterprise.  Shortly after signing this new agreement, and as discussed above, RYAN would send a congratulatory message to Defendant JOHNSTON, applauding him for successfully buying the NIGHTSCAPING trademark.

50.    Within four months of signing this new agreement, RYAN had successfully induced Attraction Lights to begin negotiations to join the TANG SIP SHIONG and JOHNSTON enterprise, and the Defendants had acquired the domain sideralight.com for a website to directly compete with Plaintiffs' AMP Lighting website for professionals.

51.    Plaintiffs anticipate that, after a reasonable opportunity for further investigation or discovery, they will uncover evidence that RYAN also violated his Covenants by influencing or attempting to influence Plaintiffs' customers to cease or adversely alter their

business relationships with Plaintiffs. Plaintiffs have a legitimate business interest in their substantial relationships with specific customers.

52.     But there was a piece missing. Although they had a funding source (TANG SIP SHIONG) and a lighting installation expert (RYAN), Defendants needed an e-commerce, marketing, and website development professional to create an e-commerce enterprise to compete with Plaintiffs. Wanting to unfairly compete with Plaintiffs, they went after Ty Russum.

**_3._     _RYAN OFFICIALLY JOINS LIGHTHOUSE ON FALSE_
_PRETENSES, AND CONSPIRES WITH OTHER DEFENDANTS_
_TO SECRETLY HIRE RUSSUM AND TO TORTIOUSLY_
_INTERFERE WITH RUSSUM'S COVENANTS_**

53.     Emails and sworn testimony recently obtained by Plaintiffs reveal the truth -- that RYAN was hired by Defendants to be involved in high level decisions and to directly compete with and harm Plaintiffs through their multiple business entities. For instance, RYAN was intimately involved in the hiring of Ty Russum, the negotiations with Attraction Lights, the issues with the NIGHTSCAPING trademark, the lighting product design and selection efforts, as well as marketing efforts, all to help Defendants compete with Plaintiffs. In short, he worked directly with TANG SIP SHIONG and upper management of all the CORPORATE DEFENDANTS in their efforts to unfairly compete and conspire against Plaintiffs, and he was financially incentivized to do so.

54.     In order to conceal his role in Defendants' conspiracy, RYAN told Plaintiffs, in late 2014, that he was going to "sell" his outdoor lighting installation operation to Defendant LIGHTHOUSE FRANCHISE, and then work for LIGHTHOUSE FRANCHISE, but only in the capacity of training new franchisees on the installation of outdoor lighting.

55.     Based on this fraudulent misrepresentation, Plaintiffs did not object to RYAN's new job and asked RYAN to complete some unfinished projects for them.  Plaintiffs also reminded RYAN of his ongoing Covenants.  RYAN assured Plaintiffs' CEO that he would honor his Covenants.

56.     During RYAN's first days in his new job at LIGHTHOUSE FRANCHISE, he actively conspired with TANG SIP SHIONG and JOHNSTON to induce Russum to go to work for DEFENDANTS, in violation of Russum's own Covenants. *See* Exhibits E & F.

57.     On January 7, 2015, Russum spoke with RYAN about working with RYAN's new employers.  RYAN and Russum were well acquainted from working together for Plaintiffs.

58.     RYAN was very enthusiastic about Russum working for Defendants. RYAN was fully aware at this time that Russum had signed his own Covenants, consistent with Plaintiffs' standard practice.

59.     By email on January 8, 2015, RYAN advised Russum that he would start "putting together a list of the various [web]sites we [*i.e.,* Defendants] need work on."  As will be shown, the websites that Russum would ultimately create for DEFENDANTS include websites that are direct competitors of Plaintiffs.

60.     In this same email, RYAN asked Russum to send a copy of his noncompete agreement with Plaintiffs, explaining "we would like to have ***our*** [*i.e.,* DEFENDANTS'] attorneys take a look and see what kind of teeth it has." (emphasis added).  Thus, RYAN was fully aware that Russum was obligated to abide by his Covenants at the time he and his co-Defendants were inducing Russum to violate them.

61.     Later that day, as requested, Russum forwarded a copy of his noncompete with Plaintiffs.  RYAN responded, "Thanks Ty, I'll forward this on" – presumably to TANG SIP SHIONG, JOHNSTON, and DEFENDANTS' attorneys.

62.     DEFENDANTS' lawyers did in fact review Russum's Covenants.  Apparently, they concluded that they had sharp "teeth," as RYAN later shared with Russum that their attorneys *advised against* DEFENDANTS hiring Russum.  Yet, as will be shown, they hired Russum anyway, thus knowingly inducing Russum to breach his noncompete/confidentiality obligations to Plaintiffs.

63.     Two weeks later, on January 20, 2015, RYAN, TANG SIP SHIONG and JOHNSTON traveled to Orlando to meet with Russum to further discuss his working for DEFENDANTS despite knowing they were precluded from hiring him.   At the conclusion of the January 20, 2015, meeting in Orlando, TANG SIP SHIONG told Russum that he was "the missing piece" they needed.  Later that day RYAN sent Russum an email indicating that TANG SIP SHIONG and JOHNSTON were both impressed with what he might be able to provide to their venture.

64.      The next day, RYAN sent an email to Russum in Florida that discussed the concept of Russum building a website that would at least in part target Plaintiffs' customers.

65.     At the time, DEFENDANTS knew that Russum had been the architect of Plaintiffs' websites, and could direct the creation by others of competing websites in Plaintiffs' lighting channels cheaply and quickly, including using the techniques that would rank the websites highly in search results.  DEFENDANTS also knew that any such confidential information Russum would use belonged to Plaintiffs and was subject to a restrictive covenant.

66.     Eleven days after their meeting in Orlando, Russum began working for DEFENDANTS.  During his entire tenure with Defendants, Russum provided services from his home office in Lakeland.

67.     DEFENDANTS needed a scheme to prevent Plaintiffs from detecting that (a) Russum was violating his Covenants with Plaintiffs, and (b) DEFENDANTS had induced him to do so, and thus tortiously interfered with Plaintiffs' agreements with Russum.  TANG SIP SHIONG told Russum that TANG SIP SHIONG needed to "cover his tracks" to prevent Plaintiffs from learning that Russum was working for DEFENDANTS.  TANG SIP SHIONG had several creative ideas that he shared with Russum on how they could do this, including:

   a.   Russum should stop using his personal email address (tyrussum@gmail.com) for communications with DEFENDANTS in lieu of an alias.  So Russum set up and used the email address HKdigitalmarketing@gmail.com, with the "HK" suggesting a connection to "Hong Kong."  TANG SIP SHIONG felt this would further distance Russum from DEFENDANTS.  On February 13, 2015, TANG SIP SHIONG sent an email informing certain people within his organization to use the alternative "HK" email address when communicating with Russum as an "added precaution." Russum has testified that he understood "added precaution" to mean an added precaution against Plaintiffs discovering their conspiracy.

   b.   The CORPORATE DEFENDANTS would not pay Russum directly, but instead would arrange for payment via a payment source located in Asia.

    c.   TANG SIP SHIONG would not issue 1099's to Russum, or have Russum sign any employment related agreements, so there would be no paper trail.

68.    Russum had another meeting with RYAN, TANG SIP SHIONG and JOHNSTON on January 27, 2015. In an email sent the next day to the meeting participants, Russum provided a recap of their discussions and plans, including the services he would provide to DEFENDANTS, which mirrored many of the services that he had performed for Plaintiffs, such as:

    a.   website design and development;

    b.   search engine optimization services that would make DEFENDANTS' websites rank highly in internet search results;

    c.   marketing services, including creating and managing Google Adword campaigns to promote DEFENDANTS' websites;

    d.   creating e-commerce platforms, including their design, development, and adding content, as well as integrating them with other software, such as customer relationship management software and other software that would include payment portal and UPS capabilities;

    e.   customer service and lead management services; and

    f.   investigation into using call centers, including their ability to track and manage leads;

69.    In addition to memorializing these initial tasks, Russum memorialized some of the statements made by TANG SIP SHIONG, including that TANG SIP SHIONG was not comfortable with "3rd party involvement with [Russum]." In other words, having Russum

work with third parties outside the organization was dangerous, as it would make it more likely that Plaintiffs would learn of their conspiracy. Russum also memorialized that TANG SIP SHIONG would "look into payment through HK," *i.e.*, "covering his tracks" by paying Russum not directly from one of DEFENDANTS' bank accounts, but from a company associated with Hong Kong.

70.    Immediately upon hiring Russum, TANG SIP SHIONG requested that Russum provide TANG SIP SHIONG with extremely sensitive and valuable e-commerce analytics that Plaintiffs had developed for their business. Specifically, Russum has testified that TANG SIP SHIONG requested and was given "information about numbers of visitors [to Plaintiffs' websites] and what types of visitors they were and what platforms they were using and the operating systems and iPad versus cell phone versus Android versus desktop" and the "average number of transactions per customer." Russum admittedly retained documents with this information from his employment with Plaintiffs and, when requested, willingly shared their contents with TANG SIP SHIONG.

71.    Russum also directed the creation by others of an ecommerce website for SIDERA. This website would compete directly with Plaintiffs' AMP Lighting website by selling high quality outdoor lighting directly to professional installers. Russum used lessons learned and proprietary information that Plaintiffs had paid for during his development of the Plaintiffs' website to benefit the Defendants.

72.    As his work on the SIDERA website was being completed, Russum's role in TANG SIP SHIONG's organization of DEFENDANTS expanded to a greater variety of tasks. Russum has testified in other proceeding that he was eventually involved in all aspects of

DEFENDANTS' businesses, including their "sales, product development, and marketing -- anything related to the generation of revenue," often in direct competition with Plaintiffs.

73.     On information and belief, he disclosed a myriad of Plaintiffs' valuable confidential information to DEFENDANTS, at their request, and this information has been used and continues to be used to unfairly compete with Plaintiffs.

74.     For his part, RYAN continued breaching his Covenants and worked on marketing plans and product selection for the Attraction Lights products discussed above throughout 2015 and 2016.  He also participated in high level discussions and decisions with TANG SIP SHIONG concerning a variety of the corporate DEFENDANTS' businesses.

### 4.    THE ABANDONMENT AND SUBSEQUENT FALSE EVIDENCE OF USE OF THE NIGHTSCAPING TRADEMARK

75.     TANG SIP SHIONG remained disinterested in using the NIGHTSCAPING mark throughout 2015 and most of 2016.  In October of 2015, he told a third-party interested in acquiring the trademark, WAC Lighting, that he had made a bad investment when he bought it and he had already sold it.  He also allowed the domain he had acquired with the trademark, www.nightscaping.com, to expire, and elected not to purchase it back when he had the chance. WAC Lighting then purchased the domain and started using NIGHTSCAPING in e-commerce in connection with lighting products.[2]

76.     Also at this time, JOHNSTON was leaving the partnership. This likely played a role in the affirmative decision to abandon the NIGHTSCAPING trademark, since it had been JOHNSTON who had wanted to acquire the trademark to begin with.

---

[2] WAC Lighting's use of the NIGHTSCAPING domain was short-lived.

77.    Then, in the latter half of 2016, according to Defendants' emails, TANG SIP SHIONG reversed course and decided to try to get the domain www.nightscaping.com back from WAC Lighting.  He filed a UDRP arbitration proceeding against WAC Lighting, and began a scheme of creating fake trademark use to demonstrate that he had not lost the NIGHTSCAPING trademark rights through nonuse.  This scheme continued into the Nightscaping Cancellation Proceeding that Plaintiffs were forced to file, as was discussed herein.

78.    Specifically, in approximately September of 2016, TANG SIP SHIONG and Russum exchanged emails about creating a website that would make it *appear* like NIGHTSCAPING LLC was using the NIGHTSCAPING trademark on products in commerce, as required to maintain the registration, when, in reality, it was not doing so.  TANG SIP SHIONG explained he wanted this false evidence to "strengthen our case."  Russum quickly found that nightscapingusa.com was an available domain, and that he could acquire it immediately at low cost to create the false evidence of use on the "NIGHTSCAPING" website.  TANG SIP SHIONG authorized Russum to create this false evidence.

79.    According to the emails, Russum would not index the website so that consumers would not find it using search engines.  WAC Lighting (or any other challenger that attempted to order a product from the website to test if the website was legitimate) would not be able to order a product through the website, but would instead be provided a phone number to call.  That number could be monitored and if called, NIGHTSCAPING, LLC and its co-conspirators would scramble and add a NIGHTSCAPING sticker to a non-NIGHTSCAPING product and then sell it to the caller as a NIGHTSCAPING product.  This is not the type of "bona fide use

in commerce" that is required to maintain trademark rights.  It is the creation of false evidence to "cover [their] tracks" of non-use.

80.    DEFENDANTS would also later add content to the NIGHTSCAPING website that Russum created which touts the history of the original NIGHTSCAPING brand, including a focus on its founder, Bill Locklin.  In other words, DEFENDANTS were now using the same idea that RYAN had suggested to Plaintiffs' CEO years earlier − an idea that belonged to Plaintiffs by virtue of RYAN's Covenants with them − to compete with Plaintiffs.

81.    Russum and TANG SIP SHIONG also discussed having Defendant SCI suddenly start placing labels or placards inside its Lighthouse-branded transformers to try to avoid the TTAB or any other tribunal finding that Defendants had no rights due to nonuse of the mark.  Curiously, SCI's long-term engineer and General Manager left for another job in the midst of this scheme.

82.    Defendants ultimately lost the UDRP proceeding, and in January of 2017, began pressuring Attraction Lights to hurry and complete shop drawings because Defendants now planned to put the NIGHTSCAPING trademark on the products they had licensed from Attraction Lights. This is yet another fraudulent effort to avoid a finding of non-use.

83.    As Defendants well know, Attraction Lights bollards have been sold since 2003 and had acquired trade dress before 2016 when Defendants entered into a license agreement with Attraction Lights to sell them.  In fact, Defendant CORELIGHT acknowledged as much in their license agreement with Attraction Lights.   Customers associate them with Attraction Lights, not the old NIGHTSCAPING brand or any other brand.  This license agreement, now terminated, prohibited the sales of Attraction Lights products under any mark but Attraction

Lights, because CORELIGHT contractually agreed that all sales of Attraction Lights bollards by Defendants would inure to the benefit of Attraction Lights.

84.    Defendants have continued to alter/withhold/manufacture evidence in the Nightscaping Cancellation Proceeding filed by Plaintiffs to keep the old NIGHTSCAPING mark on the register and block Plaintiffs' trademark application. For example, as Defendant SCI's principal, TANG SIP SHIONG, has falsely testified that Defendant SCI created a NIGHTSCAPING brand label and began placing it on transformers in January of 2016. However, as discussed above, emails between the Defendants make clear that Defendants first contemplated the use of the labels many months later, toward the end of 2016.

85.    In order to avoid losing the Cancellation Proceeding due to non-use of the NIGHTSCAPING trademark, Defendants have also destroyed evidence. For example, TANG SIP SHIONG has modified electronic evidence that would prove that these product labels were not created when TANG SIP SHIONG said, but instead many months later. Because these labels were created too late to avoid a finding of non-use, TANG SIP SHIONG had to lie about their creation. When Volt demanded the electronic files for the labels in the Cancellation Proceeding, TANG SIP SHIONG destroyed evidence, including metadata that would have proved their true creation, including on at least two occasions. First, on the day he produced the native electronic files to Plaintiffs in response to discovery requests, he modified the metadata, thus destroying evidence of their true date of creation. After Plaintiffs learned of this destruction, they demanded an inspection of the original files. In preparation for that inspection, Defendants hired an expert to assist in their collection and production. Just before NIGHTSCAPING, LLC's computer forensic expert arrived to analyze the files in an effort to

support her opinion that the data had been altered accidently, TANG SIP SHIONG *again* accessed and destroyed more of the metadata in the original files.

86.    These and similar actions have greatly increased the costs of the Cancellation Proceedings, thus increasing Plaintiffs' damages due to the continued conspiracy to "cover [their] tracks."

### 5.    *DEFENDANTS HAVE TORTIOUSLY INTERFERED WITH RYAN'S COVENANTS*

87.    On information and belief, Defendants TANG SIP SHIONG and JOHNSTON knew of RYAN'S Covenants with Plaintiffs when they hired him one month prior to hiring Russum, and are therefore liable for conspiring to tortiously interfere with RYAN'S Covenants.  To the extent Defendants JOHNSTON, SIDERA, SCI, and LIGHTHOUSE attempt to deny this, they cannot deny that Plaintiffs' counsel notified them of RYAN's obligations in 2015 when Plaintiffs realized there may be a connection between some of DEFENDANTS.

88.    In addition, in March, 2017, after seeing a photo from a trade show with RYAN standing in front of a booth for NIGHTSCAPING, LLC, Plaintiffs' CEO emailed RYAN to say that he hoped RYAN had not violated his restrictive covenants through his work with any of the Defendants.

89.    The next morning, RYAN responded with false assurances, denying any involvement with any entity other than LIGHTHOUSE.  Specifically, RYAN replied:

> *I have not violated a non-compete.  I was hired specifically for and continue to work exclusively within Lighthouse Franchise Systems (a closed system) for the sole purpose of new franchisee training, technical and design advisor to our franchisees, Lighthouse photographer and videographer whilst assisting LH of Indianapolis with lighting sales when I have time*.  I am aware of some of the happenings in Sidera and

Nightscaping, but they are separate companies that have their own people and organizational structure in which I am not involved (I can barely keep up with all my Lighthouse duties as it is). ***As before, I am simply a Lighthouse employee and have no input or influence in those other companies.*** (emphasis added).

90.    RYAN's email was false and RYAN intended Plaintiffs to rely on it in order to conceal his and DEFENDANTS' tortious actions from Plaintiffs, and Plaintiffs did so rely.

91.    As explained below, at certain times throughout the events that have given rise to Plaintiffs' claims, each of the DEFENDANTS has acted as the agent of each of the other DEFENDANTS, each conspiring at the time to engage, and engaging, in the tortious acts alleged herein, each taking steps in furtherance of the conspiracy, and each receiving benefits and harming Plaintiffs through their participation.  By way of examples only:

    a.    Defendant TANG SIP SHIONG is the ultimate owner, if not the sole ultimate owner, of all the CORPORATE DEFENDANTS and controls their day-to-day operations.  Thus, he is their agent and his actions in furtherance of the tortious actions and conspiracy and/or for the benefit of any the CORPORATE DEFENDANTS are chargeable to each of them.

    b.    RYAN, upon being hired by LIGHTHOUSE FRANCHISE, acted as the agent of TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS, in furtherance of their conspiracy,   RYAN accepted employment with LIGHTHOUSE FRANCHISE in order to conceal his wrongful actions on behalf of all DEFENDANTS from Plaintiffs, and DEFENDANTS in turn received the benefits of Plaintiffs' confidential information, and compensated RYAN for his unlawful conduct.  Prior to his retention, RYAN was a separate

actor from TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS.

c.   Upon RYAN's retention or shortly thereafter, Defendants TANG SIP SHIONG, RYAN and JOHNSTON traveled to Orlando in order to meet with Russum and induce him to violate his agreements with Plaintiffs, for their own benefit for the benefit of each of the CORPORATE DEFENDANTS, and conspired about how to conceal Russum's unauthorized services on behalf of all DEFENDANTS despite knowledge of his Restrictive Covenants.  Defendant TANG SIP SHIONG also expressly asked Russum to disclose Plaintiffs' confidential marketing schemes and techniques, and proprietary information about Plaintiff's customers, and to employ those schemes and techniques for the benefit of DEFENDANTS' various websites.

d.   Similarly, after he was retained by DEFENDANTS, Russum performed services for each of DEFENDANTS and, in doing so, procured for them the benefits of Plaintiffs' valuable confidential information, and as such his actions after being hired are chargeable to each of them under an agency theory.

e.   Defendants SCI and LIGHTHOUSE MANUFACTURING also participated in the conspiracy and compensated Russum for his services to all DEFENDANTS in violation of his Covenants with Plaintiffs.

f.   Defendant NIGHTSCAPING, LLC, also participated in the conspiracy by obtaining the benefits of Plaintiffs' wrongfully disclosed valuable confidential information concerning, *inter alia*, the NIGHTSCAPING trademark as

discussed herein, and also benefitted from the receipt and use of Plaintiffs' confidential internet marketing techniques and customer data.

g.  Defendant SIDERA also benefitted from the receipt and use of Plaintiffs' confidential marketing techniques and customer data.

h.  Defendant CORELIGHT also participated in the conspiracy through the use of its resources, including its e-mail system to send and receive messages, in furtherance of the conspiracy, and by making its products available for rebranding and sale as NIGHTSCAPING-branded products in order to further DEFENDANTS' fraudulent scheme to cover their non-use of the NIGHTSCAPING trademark.

i.  There is likely to be further evidentiary support for the liability of each of the DEFENDANTS in furtherance of their conspiracy and tortious activity after a reasonable opportunity for further investigation or discovery.

92.  All conditions precedent to this suit have either been met or waived.

93.  Plaintiffs have had to retain counsel and are obligated to pay their reasonable fees and costs, which are taxable to Defendants as set forth in the appropriate counts below.

## COUNT 1: INJUNCTIVE RELIEF (ALL DEFENDANTS)

94.  Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     As set forth above, Defendants have misappropriated and are using Plaintiffs' valuable confidential and proprietary information to unfairly compete with Plaintiffs, in violation of Russum's and RYAN's Covenants.

96.     Plaintiffs reasonably believe that DEFENDANTS possess additional confidential and proprietary information of Plaintiffs, and DEFENDANTS will continue to attempt to access and use this information absent an Order of this Court, including but not limited to using this information.  This information is highly competitively sensitive, and has been developed at great effort and expense by Plaintiffs.

97.     Defendants' use of this information to compete against Plaintiffs, as well as their competitive activity, has caused and will continue to cause Plaintiffs irreparable injury, both monetarily and to its business reputation, and there is no plain, speedy and adequate remedy at law to address these injuries.

98.     In his Covenants, RYAN agreed that Plaintiffs were entitled to injunctive relief to restrain the violation of the terms of the Covenants, including the use of Plaintiffs' confidential information and RYAN's prohibition against working for a competitor.

99.     Enjoining Defendants from using Plaintiffs' information and from engaging in competitive activity in accordance with RYAN's and/or Russum's Covenants will not disserve the public interest, will preserve the status quo pending a trial on the merits, and is favored by the balance of equities in this case.

100.    Plaintiffs' remedies at law are inadequate and it is necessary to seek expeditious relief in equity.

WHEREFORE, pursuant to Fed. R. Civ. P. 65, Plaintiffs respectfully request that the Court issue preliminary and permanent injunctions:

a.  prohibiting DEFENDANTS, and all those in active concert with them, from further use of Plaintiffs' confidential and proprietary information disclosed by RYAN or Russum;

b.  prohibiting RYAN's continued employment with DEFENDANTS for a period of two years from the date of such injunction, as agreed by RYAN in his Covenants, which expressly includes his agreement that "the period of time during which [he] is prohibited from [competing with Plaintiffs] shall be extended by any length of time during which [RYAN] is in breach of these covenants";

c.  prohibiting DEFENDANTS, and all those in active concert with them, from using the NIGHTSCAPING registration to assert or defend against claims of trademark infringement;

d.  compelling DEFENDANTS to file a notice of abandonment of the NIGHTSCAPING trademark registration with the USPTO, or alternatively, conveying all rights, title and interest in the registration to Plaintiffs so that Plaintiffs may file a notice of abandonment with the USPTO, in order to remove the wrongfully obtained registration as a "blocking mark" that prevents the issuance as a registration of Plaintiffs' pending and otherwise allowed trademark application;

e.   prohibiting DEFENDANTS, and all those in active concert with them, from further tortiously interfering with Plaintiffs' rights under the Russum and RYAN Covenants, and any other covenants that Plaintiff may have with any current or former employees or independent contractors.

**COUNT 2:  ASSIGNMENT OR EXPRESS ABANDONMENT OF NIGHTSCAPING TRADEMARK REGISTRATION 770,661 (NIGHTSCAPING, LLC AND TANG SIP SHIONG)**

101.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

102.    DEFENDANT NIGHTSCAPING, LLC has obtained Registration Number 770,661 for the NIGHTSCAPING Trademark through the unlawful acquisition of Plaintiffs' valuable confidential information that was furnished to RYAN pursuant his Covenants with Plaintiffs.

103.    Because Registration Number 770,661 for the NIGHTSCAPING Trademark was fraudulently obtained and maintained, it is being held in constructive trust for Plaintiffs.

104.    Registration Number 770,661 for the NIGHTSCAPING Trademark is invalid and NIGHTSCAPING, LLC's maintenance of it on the Principal Trademark Register is damaging Plaintiff VOLT by preventing it from receiving a registered trademark based on its pending application.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in favor of Plaintiffs and against NIGHTSCAPING, LLC and TANG SIP SHIONG compelling them to either file an express abandonment of Registration Number 770,661 with the USPTO and/or

compelling them to assign Registration Number 770,661 to Plaintiffs so that they may file an express abandonment with the USPTO.

## COUNT 3:  CONFIDENTIALITY NON-DISCLOSURE AGREEMENT SIGNED MAY 13, 2013 (RYAN)

105.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

106.    In his Confidentiality Non-Disclosure Agreement, RYAN agreed to a number of obligations as set forth at Exhibit A. These include, but are not limited to, obligations to: (a) not disclose Plaintiffs' confidential information to third parties or use it except pursuant to his obligations to Plaintiffs; (b) to assign any ideas or improvements he had relating to Plaintiffs' business to Plaintiffs, even if jointly created with others; and (c) that any writings or other property (such as photos or videos) that he created for Plaintiffs would belong to Plaintiffs, and that he would not retain any copies after he separated from Plaintiffs.

107.    The Confidentiality Non-Disclosure Agreement is a valid and enforceable contract, which is supported by adequate consideration.

108.    Plaintiffs performed all their obligations under RYAN's Confidentiality Non-Disclosure Agreement, and provided RYAN with substantial benefits as a result of his retention, employment, and access to Plaintiffs' confidential, proprietary information.

109.    RYAN breached his Confidentiality Non-Disclosure Agreement.

110.    Plaintiffs have suffered damages as a result of RYAN's breach of his Confidentiality Non-Disclosure Agreement.

111.    Any and all conditions precedent necessary to the assertion of this claim have occurred.

WHEREFORE, Plaintiffs respectfully request that the Court: enter judgment against RYAN and in favor of Plaintiffs; award Plaintiffs preliminary and permanent injunctions against RYAN, pursuant to Fla. Stat. 542.335(j) and the Confidentiality Non-Disclosure Agreement; award Plaintiffs damages for RYAN's violation of his Confidentiality Non-Disclosure Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, attorney's fees, expert and investigator fees, premiums for bonds, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his duties, as permitted by the Confidentiality Non-Disclosure Agreement; consequential and exemplary damages, pre- and post-judgment interests; and such other and further relief as the Court deems just and proper.

## COUNT 4:  BREACH OF INDEPENDENT CONTRACTOR AND ASSIGNMENT AGREEMENT SIGNED MAY 13, 2013 (RYAN)

112.    Plaintiffs re-allege and incorporates by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

113.    In his Independent Contractor and Assignment Agreement, RYAN agreed to a number of obligations as set forth at Exhibit B.  These include, but are not limited to, obligations to:  (a) not disclose Plaintiffs' confidential information to third parties or use it except pursuant to his obligations to Plaintiffs; (b) to assign any ideas or improvements he had relating to Plaintiffs' business to Plaintiffs, even if jointly created with others; and (c) that any writings or other property that he created for Plaintiffs would belong to Plaintiffs.

114.    The Independent Contractor and Assignment Agreement is a valid and enforceable contract, which is supported by adequate consideration.

115.     Plaintiffs performed all their obligations under RYAN's Independent Contractor and Assignment Agreement, and provided RYAN with substantial benefits as a result of his retention, employment, and access to Plaintiffs' confidential, proprietary information.

116.     RYAN breached his Independent Contractor and Assignment Agreement.

117.     Plaintiffs have suffered damages as a result of RYAN's breach of his Independent Contractor and Assignment Agreement.

118.     Any and all conditions precedent necessary to the assertion of this claim have occurred.

WHEREFORE, Plaintiffs respectfully request that the Court:  enter judgment against RYAN and in favor of Plaintiffs; award Plaintiffs preliminary and permanent injunctions against RYAN, pursuant to Fla. Stat. 542.335(j); award Plaintiffs damages for RYAN's violation of his Independent Contractor and Assignment Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, premiums for bonds, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his duties, consequential and exemplary damages, pre- and post-judgment interests; and such other and further relief as the Court deems just and proper.

## COUNT 5:  BREACH OF NONCOMPETE AND CONFIDENTIALITY AGREEMENT SIGNED SEPTEMBER 9, 2013, AS AMENDED ON JUNE 25, 2014 (RYAN)

119.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

120.    In his Noncompete and Confidentiality Agreement, RYAN agreed to a number of obligations as set forth at Exhibit C-1 and C-2. These include, but are not limited to, obligations to:  (a) not directly or indirectly become affiliated with any manufacturer that competes with Plaintiffs, other than continuing his association with Attraction Lights from the period June 25, 2014 until his separation from Plaintiffs; (b) not divert business from Plaintiffs; (c) not disclose Plaintiffs' confidential information to third parties or use it except pursuant to his obligations to Plaintiffs; (d) to assign any ideas or improvements he had relating to Plaintiffs' business to Plaintiffs, even if jointly created with others; and (e) that any writings or other property (such as photos or videos) that he created for Plaintiffs would belong to Plaintiffs, and that he would not retain any copies after he separated from Plaintiffs.

121.    The Noncompete and Confidentiality Agreement is a valid and enforceable contract, which is supported by adequate consideration.

122.    Plaintiffs performed all their obligations under RYAN's Noncompete and Confidentiality Agreement, and provided RYAN with substantial benefits as a result of his retention, employment, and access to Plaintiffs' confidential and proprietary information.

123.    RYAN breached his Noncompete and Confidentiality Agreement.

124.    Plaintiffs have suffered damages as a result of RYAN's breach of his Noncompete and Confidentiality Agreement.

125.    Any and all conditions precedent necessary to the assertion of this claim have occurred.

WHEREFORE, Plaintiffs respectfully request that the Court:  enter judgment against RYAN and in favor of Plaintiffs; award Plaintiffs preliminary and permanent injunctions

against RYAN, pursuant to Fla. Stat. 542.335(j) and the Noncompete and Confidentiality Agreement; award Plaintiffs damages for RYAN's violation of his Noncompete and Confidentiality Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, attorney's fees, expert and investigator fees, premiums for bonds, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his duties, as permitted by the Noncompete and Confidentiality Agreement; consequential and exemplary damages, pre- and post-judgment interests; and such other and further relief as the Court deems just and proper.

## COUNT  6: BREACH OF CONSULTANT INTELLECTUAL PROPERTY AGREEMENT SIGNED OCTOBER 3, 2013 (RYAN)

126.    Plaintiffs re-allege and incorporates by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

127.    In his Consultant Intellectual Property Agreement, RYAN agreed to several obligations, as set forth at Exhibit D.  These include, but are not limited to, obligations to:  (a) not disclose Plaintiffs' confidential information to third parties or use it except pursuant to his obligations to Plaintiffs, including during and at any time after his separation from Plaintiffs; (b) assign all rights in the items he created and ideas he had during his retention that related to the scope of Plaintiffs' business; (c) not "engage in any activity which may constitute a conflict with [Plaintiffs'] interests regarding Confidential Information or Developments; and (d)  leave all originals and copies of any written materials or other property made or compiled by him while working for Plaintiffs.

128.    The Consultant Intellectual Property Agreement is a valid and enforceable contract, which is supported by adequate consideration.

129.    Plaintiffs performed all their obligations under RYAN's Consultant Intellectual Property Agreement, and provided RYAN with substantial benefits as a result of his retention, employment, and access to Plaintiffs' confidential, proprietary information.

130.    RYAN breached his Consultant Intellectual Property Agreement.

131.    Plaintiffs have suffered damages as a result of RYAN's breach of his Consultant Intellectual Property Agreement.

132.    Any and all conditions precedent necessary to the assertion of this claim have occurred.

WHEREFORE, Plaintiffs respectfully request that the Court:  enter judgment against RYAN and in favor of Plaintiffs; award Plaintiffs preliminary and permanent injunctions against RYAN, pursuant to Fla. Stat. 542.335(j); award Plaintiffs damages for RYAN's violation of his Consultant Intellectual Property Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, premiums for bonds, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his duties, consequential and exemplary damages, pre- and post-judgment interests; and such other and further relief as the Court deems just and proper.

**COUNT  7:  TORTIOUS INTERFERENCE WITH RYAN'S CONFIDENTIALITY NON-DISCLOSURE AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)**

133.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

134.    Plaintiffs had a valid Confidentiality Non-Disclosure Agreement with RYAN, evidenced by Exhibit A.

135.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Confidentiality Non-Disclosure Agreement with RYAN, inducing RYAN to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

136.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

137.    The interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS with Plaintiffs' Confidentiality Non-Disclosure Agreement with RYAN, in an amount to be proven at trial, including special damages in the

form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 8: TORTIOUS INTERFERENCE WITH RYAN'S INDEPENDENT CONTRACTOR AND ASSIGNMENT AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)

138.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

139.    Plaintiffs had a valid Independent Contractor and Assignment Agreement with RYAN, evidenced by Exhibit B.

140.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Independent Contractor and Assignment Agreement with RYAN, inducing RYAN to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

141.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

142.    The interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs,

and the Court award damages for the interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS with Plaintiffs' Independent Contractor and Assignment Agreement with RYAN, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

<u>**COUNT 9:  TORTIOUS INTERFERENCE WITH RYAN'S NONCOMPETE AND CONFIDENTIALITY AGREEMENT WITH PLAINTIFFS SIGNED MAY 9, 2013 AND AMENDED JUNE 25, 2014 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)**</u>

143.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

144.    Plaintiffs had a valid Noncompete and Confidentiality Agreement with RYAN, evidenced by Exhibit C-1, as amended by Exhibit C-2.

145.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Noncompete and Confidentiality Agreement with RYAN, inducing RYAN to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

146.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information and having RYAN otherwise compete with Plaintiffs despite his contract.

147.    The interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS with Plaintiffs' Noncompete and Confidentiality Agreement with RYAN, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 10:  TORTIOUS INTERFERENCE WITH RYAN'S CONSULTANT INTELLECTUAL PROPERTY AGREEMENT WITH PLAINTIFFS DATED OCTOBER 3, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)

148.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

149.    Plaintiffs had a valid Consultant Intellectual Property Agreement with RYAN, evidenced by Exhibit D.

150.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Consultant Intellectual Property Agreement with RYAN, inducing RYAN to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

151.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information and having RYAN otherwise compete with Plaintiffs despite his contract.

152.    The interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the interference by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS with Plaintiffs' Consultant Intellectual Property Agreement with RYAN, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

## COUNT 11:  TORTIOUS INTERFERENCE WITH RUSSUM'S NONCOMPETE AND CONFIDENTIALITY AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (ALL DEFENDANTS)

153.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

154.    Plaintiffs had a valid Noncompete and Confidentiality Agreement with Russum, evidenced by Exhibit E.

155.    DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Noncompete and Confidentiality Agreement with Russum, inducing Russum to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

156.    DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information and having Russum otherwise compete with Plaintiffs despite his contract.

157.    The interference by DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the interference by DEFENDANTS with Plaintiffs' Noncompete and Confidentiality Agreement with Russum, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

**COUNT  12:  TORTIOUS INTERFERENCE WITH RUSSUM'S EMPLOYEE INTELLECTUAL PROPERTY AGREEMENT WITH PLAINTIFFS DATED SEPTEMBER 9, 2013 (ALL DEFENDANTS)**

158.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

159.    Plaintiffs had a valid Employee Intellectual Property Agreement with Russum, evidenced by Exhibit F.

160.    DEFENDANTS unjustifiably and intentionally interfered with Plaintiffs' Employee Intellectual Property Agreement with Russum, inducing Russum to terminate his contract with Plaintiffs, despite their knowledge of Plaintiffs' contract with him.

161.    DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

162.    The interference by DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the interference by DEFENDANTS with Plaintiffs' Employee Intellectual Property Agreement with Russum, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 13: AIDING AND ABETTING BREACH OF RYAN'S CONFIDENTIALITY NON-DISCLOSURE AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)

163.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

164.    Plaintiffs had a valid Confidentiality Non-Disclosure Agreement with RYAN, evidenced by Exhibit A.

165.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS provided substantial assistance to RYAN to breach the Confidentiality Non-Disclosure Agreement, despite their knowledge of Plaintiffs' contract with him.

166.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

167.    The aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS of RYAN's breach of his Confidentiality Non-Disclosure Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

**COUNT  14:  AIDING AND ABETTING BREACH OF RYAN'S INDEPENDENT CONTRACTOR AND ASSIGNMENT AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)**

168.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

169.    Plaintiffs had a valid Independent Contractor and Assignment Agreement with RYAN, evidenced by Exhibit B.

170.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS provided substantial assistance to RYAN to breach the Independent Contractor and Assignment Agreement, despite their knowledge of Plaintiffs' contract with him.

171.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

172.    The aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS of RYAN's breach of his Independent Contractor and Assignment Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

**COUNT 15:  AIDING AND ABETTING BREACH OF RYAN'S NONCOMPETE AND CONFIDENTIALITY AGREEMENT WITH PLAINTIFFS SIGNED MAY 9, 2013 AND AMENDED JUNE 25, 2014 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)**

173.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

174.    Plaintiffs had a valid Noncompete and Confidentiality Agreement with RYAN, evidenced by Exhibit C-1, as amended by Exhibit C-2.

175.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS provided substantial assistance to RYAN to breach the Noncompete and Confidentiality Agreement, despite their knowledge of Plaintiffs' contract with him.

176.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

177.    The aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS of RYAN's breach of his Noncompete and Confidentiality Agreement, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages,

pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 16: AIDING AND ABETTING BREACH OF RYAN'S CONSULTANT INTELLECTUAL PROPERTY AGREEMENT WITH PLAINTIFFS DATED OCTOBER 3, 2013 (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)

178.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

179.    Plaintiffs had a valid Consultant Intellectual Property Agreement with RYAN, evidenced by Exhibit D.

180.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS provided substantial assistance to RYAN to breach the Consultant Intellectual Property Agreement, despite their knowledge of Plaintiffs' contract with him.

181.    TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

182.    The aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by TANG SIP SHIONG, JOHNSTON, and the CORPORATE DEFENDANTS of RYAN's breach of his Consultant Intellectual Property Agreement, in an amount to be proven at trial, including special damages

in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

## COUNT 17:  AIDING AND ABETTING BREACH OF RUSSUM'S NONCOMPETE AND CONFIDENTIALITY AGREEMENT WITH PLAINTIFFS SIGNED MAY 13, 2013 (ALL DEFENDANTS)

183.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

184.    Plaintiffs had a valid Noncompete and Confidentiality Agreement with Russum, evidenced by Exhibit E.

185.    DEFENDANTS provided substantial assistance to Russum to breach the Noncompete and Confidentiality Agreement, despite their knowledge of Plaintiffs' contract with him.

186.    DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

187.    The aiding and abetting by DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by DEFENDANTS of Russum's breach of his Noncompete and Confidentiality Agreement, in an amount to be proven at trial,  including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs,

expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

## COUNT 18: AIDING AND ABETTING BREACH OF RYAN'S EMPLOYEE INTELLECTUAL PROPERTY AGREEMENT WITH PLAINTIFFS DATED SEPTEMBER 9, 2013 (ALL DEFENDANTS)

188.    Plaintiffs' re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

189.    Plaintiffs had a valid Employee Intellectual Property Agreement with Russum, evidenced by Exhibit F.

190.    DEFENDANTS provided substantial assistance to Russum to breach the Employee Intellectual Property Agreement, despite their knowledge of Plaintiffs' contract with him.

191.    DEFENDANTS were motivated by spite, ill-will, or other bad motive, including a motivation to compete unfairly with Plaintiffs through the use of Plaintiffs' valuable confidential information despite his contract.

192.    The aiding and abetting by DEFENDANTS caused damage to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered DEFENDANTS and in favor of Plaintiffs, and the Court award damages for the aiding and abetting by DEFENDANTS of Russum's breach of his Employee Intellectual Property Agreement, in an amount to be proven at trial, , including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, expenses, expert and investigator fees, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

## COUNT 19:  CIVIL CONSPIRACY (ALL DEFENDANTS CONSPIRING WITH RUSSUM)

193.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

194.    DEFENDANTS, on the one hand, conspired with Russum, a separate actor, to begin providing services to DEFENDANTS in breach of his Covenants with Plaintiffs and to misappropriate Plaintiffs' valuable confidential business information and unfairly compete with Plaintiffs as alleged herein.

195.    The scheme by DEFENDANTS and Russum as alleged herein constitutes a conspiracy to do an unlawful act, or a lawful act by unlawful means.

196.    By conspiring with Russum, who was located in Florida, to engage in and perform tortious actions in Florida to unfairly compete with Plaintiffs, DEFENDANTS are subject to jurisdiction in Florida and this District.

197.    DEFENDANTS conspired with Russum with the full knowledge of his possession of Plaintiffs' confidential and proprietary information and his Covenants with Plaintiffs.

198.    The acts by the DEFENDANTS, as alleged herein, constitute acts in pursuance of the conspiracy with Russum, including but not limited to, the following acts: (1) arranging and carrying out of a meeting with Russum in Florida in order to induce him to violate his agreements with Plaintiffs and to disclose Plaintiffs' confidential information and documents to DEFENDANTS to unfairly compete with Plaintiffs, (2) inducing Russum to compete with Plaintiffs, (3) inducing Russum to wrongfully remove Plaintiffs' files, and (4) compensating Russum in exchange for his violations of his Covenants with Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against DEFENDANTS and in favor of Plaintiffs for their conspiracy with Russum, and the Court award damages against DEFENDANTS in an amount to be proven at trial, , including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 20:  CIVIL CONSPIRACY (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS CONSPIRING WITH RYAN)

199.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

200.    TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS, on the one hand, conspired with RYAN, a separate actor, to begin providing services to TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS in breach of his Covenants with Plaintiffs and to misappropriate Plaintiffs' valuable confidential business information and unfairly compete with Plaintiffs as alleged herein.

201.    The scheme by TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS and RYAN as alleged herein constitutes a conspiracy to do an unlawful act, or a lawful act by unlawful means.

202.    TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS conspired with RYAN with the full knowledge of his possession of Plaintiffs' confidential and proprietary information and his Covenants with Plaintiffs.

203.    The acts by the TANG SIP SHIONG, JOHNSTON, AND CORPORATE defendants, as alleged herein, constitute acts in pursuance of the conspiracy with RYAN,

including but not limited to, the following acts: (1) inducing RYAN to violate his agreements with Plaintiffs and to disclose Plaintiffs' confidential information and documents to DEFENDANTS to unfairly compete with Plaintiffs (2) inducing RYAN to compete with Plaintiffs, (3) inducing RYAN to wrongfully remove Plaintiffs' files, and (4) compensating RYAN in exchange for his violations of his Covenants with Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS and in favor of Plaintiffs for their conspiracy with RYAN, and the Court award damages for TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS' civil conspiracy, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, in addition to Plaintiffs' costs, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

## COUNT 21:  UNJUST ENRICHMENT (TANG SIP SHIONG, JOHNSTON, AND CORPORATE DEFENDANTS)

204.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

205.    TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS have wrongfully accepted and retained, and continue to accept and retain, the benefits of the proprietary and valuable confidential information misappropriated from Plaintiffs.

206.    As a result of their wrongful conduct, TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS have been and continue to be enriched without cause at the expense of Plaintiffs in an amount to be determined at trial.

207.    There is no plain, speedy and adequate remedy at law to address these injuries

WHEREFORE, Plaintiffs respectfully requests that judgment be entered against TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS and in favor of Plaintiffs, and this Court award damages for the unjust enrichment of TANG SIP SHIONG, JOHNSTON, and CORPORATE DEFENDANTS in an amount to be proven at trial, in addition to Plaintiffs' costs, consequential and exemplary damages, pre- and post-judgment interests, and such other and further relief as the Court deems just and proper.

### COUNT 22:  STATE DECEPTIVE AND UNFAIR TRADE PRACTICES IN VIOLATION OF FLORIDA STATUTE §501.201, *ET SEQ.* (ALL DEFENDANTS)

208.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

209.    Plaintiffs have suffered, and continue to suffer, actual injury in fact due to the deliberate acts by DEFENDANTS without regard to Plaintiffs' legal, contractual, and exclusive proprietary rights.

210.    DEFENDANTS' knowing acts and practices as detailed above constitute acts of unlawful, unfair or deceptive business acts and practices within the meaning of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

211.    Pursuant to FDUTPA, Plaintiffs seek an order from this Court prohibiting DEFENDANTS from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint.

212.    Also pursuant to §501.211, Plaintiffs are entitled to its actual damages, including DEFENDANTS' profits and Plaintiffs' lost profits.

213.     Pursuant to §501.211, Florida Statutes, Plaintiffs are entitled to an award of their attorney's fees and costs in bringing this action.

214.     Plaintiffs further request a court order that a constructive trust be imposed over all monies in Defend DEFENDANTS' possession which rightfully belong to Plaintiff, as well as over Registration Number 770,661 for the NIGHTSCAPING Trademark.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against DEFENDANTS and in favor of Plaintiffs, and this Court award damages for DEFENDANTS' violation of §501.201 *et. seq.,* Florida Statutes, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, DEFENDANTS' profits, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his agreement, Plaintiffs' lost profits, attorneys' fees, Plaintiffs' costs, consequential and exemplary damages**,** pre- and post-judgment interests, an injunction preventing DEFENDANTS from engaging or continuing to engage in the unlawful, unfair, or deceptive business acts or practices set forth in this Complaint, and such other and further relief as the Court deems just and proper.

## COUNT 23:  UNFAIR COMPETITION (ALL DEFENDANTS)

215.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 of this Complaint as if fully set forth herein.

216.     Plaintiffs have expended significant sums of money in developing and protecting their highly confidential information.

217.    DEFENDANTS have knowingly and willfully and/or with reckless disregard of Plaintiff's rights appropriated Plaintiffs' valuable confidential information through unfair tactics.

218.    DEFENDANTS' acts constitute unfair competition and will, unless enjoined by this Court, result in the destruction of Plaintiffs' confidential information, to the unjust enrichment of Defendants.

219.    The continued wrongful possession and use of Plaintiffs' confidential information as alleged herein, including the wrongful acquisition and maintenance of the Trademark Registration 770,661 for NIGHTSCAPING, has caused and unless restrained, will continue to cause serious and irreparable injury to Plaintiffs.

220.    Plaintiffs have no adequate remedy at law and will suffer irreparable harm as a result of DEFENDANTS' acts.

221.    Plaintiffs have suffered damages as a result of Defendants' acts.

222.    DEFENDANTS committed the alleged acts intentionally, fraudulently, maliciously, willfully, wantonly, and oppressively and/or with a reckless disregard of Plaintiffs' rights with the intent to injure Plaintiffs and their business

WHEREFORE, Plaintiffs respectfully request that judgment be entered against DEFENDANTS and in favor of Plaintiffs, and this Court award damages for DEFENDANTS' unfair competition, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, DEFENDANTS' profits, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his agreement, Plaintiffs' lost profits, Plaintiffs' costs, consequential and exemplary

damages**,** pre- and post-judgment interests, an injunction preventing DEFENDANTS from engaging or continuing to engage in the unfair competition set forth in this Complaint, and such other and further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs hereby respectfully request that the Court grant the following relief:

1.    Enter judgment in Plaintiffs' favor, and against all DEFENDANTS on all of Plaintiffs' claims for relief, and award Plaintiffs compensatory damages, in an amount to be proven at trial, including special damages in the form of costs and fees incurred in litigating the Cancellation Proceeding, Plaintiffs' costs, expenses, attorney's fees, expert and investigator fees, premiums for bonds, RYAN's revenues, remuneration, or other consideration received from all activities in breach of his duties, DEFENDANTS' profits, Plaintiffs' lost profits, attorneys' fees, Plaintiffs' costs, consequential and exemplary damages**,** pre- and post-judgment interest in their favor and against all DEFENDANTS in an amount to be proven at trial;

2.    Grant the preliminary and permanent injunctive relief requested; and

3.    Grant Plaintiffs such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  July 8, 2019.

Respectfully submitted,

James M. Matulis
Florida Bar No. 0077429
Law Office of James Matulis
9806 Gretna Green Drive, Suite 100
Tampa, FL 33626
Jim@Matulis-Law.com
Tel. (813) 451-7347
*Attorney for Plaintiffs*